# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| CHARLES SINGER, )<br><br>    Plaintiff, )<br>  vs. )<br><br>LAS VEGAS ATHLETIC CLUBS, )<br><br>    Defendants. )<br>_____ ) | Case No.: 2:17-cv-01115-GMN-VCF<br><br>**ORDER** |

   Pending before the Court are the Motions for Summary Judgment, (ECF Nos. 23, 24), filed by Plaintiff Charles Singer ("Plaintiff") and Defendant Las Vegas Athletic Clubs ("LVAC"). Plaintiff and LVAC filed Responses, (ECF Nos. 28, 29), as well as Replies, (ECF Nos. 32, 33), in support of their respective Motions.

   Also pending before the Court are the fully briefed Motions to Amend Complaint and to Stay the Case, (ECF Nos. 22, 37), filed by Plaintiff and LVAC, respectively.[1]

   For the reasons discussed below, Plaintiff's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**; LVAC's Motion for Summary Judgment is **DENIED**; Plaintiff's Motion to Amend is **DENIED**; and LVAC's Motion to Stay is **DENIED**.

## I.  BACKGROUND

   This case arises from LVAC's alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA") by way of its efforts to collect Plaintiff's unpaid gym membership dues. In 2015, Plaintiff signed a gym membership agreement (the "Membership Agreement") with LVAC under which Plaintiff agreed to pay $23.00 per month in exchange for

---

[1] LVAC's unopposed Motion for Leave to File Supplemental Authority, (ECF No. 34), is **GRANTED**.

access to LVAC's fitness facilities. (*See* Membership Agreement, Ex. 1-B to LVAC's MSJ, ECF No. 24-1). By signing the Membership Agreement, Plaintiff authorized LVAC to contact him on the cell phone number he provided, and to do so "by any method, including use of a predictive dialer." (*Id.*). The Membership Agreement also states: "This Contract may be modified only by an instrument in writing." (*Id.*).

On October 8, 2016, after Plaintiff defaulted on his monthly dues, LVAC initiated debt collection associated with Plaintiff's account. (LVAC Decl. ¶ 12, Ex. 1 to LVAC's MSJ, ECF No. 24-1). To effectuate its debt collection, LVAC agents are licensed to use computerized telephone software designed by Nuxiba Technologies, Inc. ("Nuxiba"). (Nuxiba Decl. ¶ 2, Ex. 2 to LVAC's MSJ, ECF No. 24-2). The Nuxiba system operates by dialing phone numbers from a list "loaded into the system by an LVAC system administrator," and connecting available LVAC agents to live calls. (*Id.* ¶ 4); (LVAC's 30(b)(6) Dep. 23:7–16, Ex. 2 to Pl.'s Reply, ECF No. 32-2).

LVAC began placing calls to Plaintiff's cell phone on December 29, 2016, using the Nuxiba system. (Pl.'s Decl. ¶¶ 2, 3, Ex. 2 to Pl.'s MSJ, ECF No. 23-2). Plaintiff spoke with an LVAC representative on three occasions, during which Plaintiff stated he did not have money to pay off his debt and no longer wanted to receive LVAC's calls. (Collection Notes, Ex. 4 to Pl.'s MSJ, ECF No. 23-4). LVAC continued to place calls to Plaintiff until at least April of 2017. (Pl.'s Decl. ¶¶ 5, 7, 10, ECF No. 23-2).

Plaintiff filed this action on April 21, 2017, bringing two claims against LVAC for violation of the TCPA and intrusion upon seclusion. (*See* Compl. ¶¶ 24–29, ECF No. 1). In April 2018, Plaintiff and LVAC filed their respective Motions for Summary Judgment, (ECF Nos. 23, 24).

## II.    <u>LEGAL STANDARD</u>

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and

the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50

## III. <u>DISCUSSION</u>

### A. Telephone Consumer Protection Act

Plaintiff and LVAC each seek summary judgment on Plaintiff's TCPA claim. (Pl.'s MSJ 3:6–9, ECF No. 23); (LVAC's MSJ 1:18–21, ECF No. 24). Plaintiff contends that LVAC knowingly or willfully persisted in calling him without his consent using an automatic telephone dialing system ("ATDS"). (Pl.'s MSJ 6:9–14:17). LVAC argues that Plaintiff cannot demonstrate that an ATDS was used, and regardless, Plaintiff consented to being called under

the parties' Membership Agreement. (LVAC's MSJ 6:4–13:4). LVAC also moves the Court to stay this action, asserting that new controlling authority on the definition of an ATDS is impending. (*See* Mot. to Stay, ECF No. 37). Before turning to the merits of Plaintiff's claim, the Court first considers the impact of recent developments in TCPA jurisprudence, followed by LVAC's request for a stay.

### 1.  Authority Defining an ATDS

Under the TCPA, it is unlawful "to make any call . . . using any automatic telephone dialing system" to any "cellular telephone service," without the called party's prior consent. *See* 47 U.S.C. § 227(b)(1)(A)(iii). To implement the TCPA, Congress vested the Federal Communications Commission ("FCC") with the authority to issue rules and regulations. *See id.* § 227(b)(2).

The TCPA defines an ATDS as "equipment which has the capacity (a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers." *See id.* § 227(a)(1). In 2015, the FCC issued a declaratory order (the "2015 FCC Order") suggesting an ATDS may include systems that dial from "a fixed set of numbers," despite lacking the capability to dial randomly or sequentially. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 (2015 FCC Order)*, 30 FCC Rcd. 7961, 7972–78 (2015).

Following the 2015 FCC Order, several regulated entities challenged the FCC's definition of an ATDS in the D.C. and Seventh Circuits, culminating in a consolidated petition in the D.C. Circuit. *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1043–47 (9th Cir. 2018). In March 2018, the D.C. Circuit Court of Appeals set aside the FCC's interpretation of an ATDS, finding it to be "an unreasonably, and impermissibly, expansive one." *ACA Int'l v.*

*Fed. Commc'ns Comm'n*, 885 F.3d 687, 700 (D.C. Cir. 2018).[2]  The Court reasoned that the FCC's definition is ambiguous as to whether it embraces software that dials from a fixed set of numbers, even if the system cannot randomly or sequentially generate numbers. *Id.* at 702–03; *see 2015 FCC Order*, 30 FCC Rcd. at 7973.  Rejecting the FCC's construction, the D.C. Circuit explained:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). It might be permissible for the [FCC] to adopt either interpretation. But the [FCC] cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

*ACA Int'l*, 885 F.3d at 702–03.

In the wake of *ACA Int'l*, the Ninth Circuit issued a decision holding that the 2015 FCC Order, as well as "any prior FCC rules that were reinstated by the 2015 order," no longer serve as binding authority as to the meaning of an ATDS. *Marks*, 904 F.3d at 1049.  Consequently, "only the statutory definition of ATDS as set forth by Congress in 1991 remains." *Id.* Interpreting the statute "anew," the Ninth Circuit held that an ATDS encompasses systems that make automatic calls from lists of recipients. *Id.* at 149–50, 1051–53.  Thus, under *Marks*, an ATDS "means equipment which has the capacity—(1) to store numbers to be called *or* (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person)." *Id.* at 1052 (emphasis added).

---

[2] The *ACA Int'l* decision is binding upon this Court because appellate courts have exclusive jurisdiction to determine the validity of all FCC final orders and the Judicial Panel on Multidistrict Litigation consolidated the appellate cases in the D.C. Circuit. *See* 28 U.S.C. § 2342(1); *see also Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008).

In response to *ACA Int'l* and *Marks*, the FCC issued requests for public comment as to the interpretation of an ATDS. *See Consumer & Governmental Affairs Bureau Seeks Comment on Interpretation of the Tel. Consumer Prot. Act in Light of the D.C. Circuit's ACA Int'l Decision*, 33 FCC Rcd. 4864 (2018); *Consumer & Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Tel. Consumer Prot. Act in Light of the Ninth Circuit's Marks v. Crunch San Diego, LLC Decision*, No. 02-278, 2018 WL 4801356, at *1 (OHMSV Oct. 3, 2018).  Against this backdrop, LVAC moves the Court to stay this action. (*See* Mot. to Stay, ECF No. 37).

## 2. LVAC's Motion to Stay

LVAC requests a stay pending the FCC's anticipated rule making following its requests for public comment. (*Id.* 1:24–2:2).  LVAC points out that under the Hobbs Act, the FCC's definition of an ATDS would control the Court's analysis to the extent it conflicted with *Marks*. (*Id.* 2:2–4).  LVAC invokes the primary jurisdiction doctrine as well as the Court's inherent authority in support of its Motion to Stay. (*Id.* 6:17–13:13).

### a. Primary Jurisdiction

Primary jurisdiction is "a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002).  In evaluating primary jurisdiction, Ninth Circuit courts consider "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 760 (9th Cir. 2015) (quoting *Syntek*, 307 F.3d at 781).

The primary jurisdiction doctrine does not apply here. "The doctrine is reserved for a 'limited set of circumstances' that 'requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency.'" *Astiana*, 783 F.3d at 760 (citation omitted). Given the *Marks* Court's construction of the TCPA, the statutory definition of an ATDS is neither an issue of first impression, nor one that judges are incompetent to decide. Applying this rationale, Ninth Circuit courts have consistently rejected requests to stay actions pending further FCC rulemaking. *See, e.g.*, *Nicholson, v. REI Energy, LLC*, No. 3:18-cv-00203-HZ, 2019 WL 993624, at *5 (D. Or. Feb. 28, 2019) (holding that in light of *Marks*, "this case presents neither an issue of first impression nor a question better suited to the expertise of the [FCC]."); *Knapper v. Cox Commc'ns, Inc.*, No. 17-cv-00913-PHX-SPL, 2019 WL 250430, at *2 (D. Ariz. Jan. 17, 2019); ("*Marks* represents binding law in this Circuit. Consequently, there is no matter of first impression or of such complexity inhibiting this Court from proceeding."); *Larson v. Harman Mgmt. Corp.*, No. 1:16-cv-00219-DAD-SKO, 2018 WL 6459964, at *4 (E.D. Cal. Dec. 10, 2018) ("The Ninth Circuit's willingness to decide the meaning of an ATDS in *Marks* also indicates that defining that term as used in the applicable statute is within the conventional experience of judges."); *Pieterson v. Wells Fargo Bank, N.A.*, No. 17-cv-02306-EDL, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) ("[T]he primary jurisdiction doctrine does not comfortably fit the circumstances of this case because the issues before the FCC are not ones of first impression and controlling or persuasive law already exists.").

Considerations of judicial efficiency also counsel against a stay. "The 'deciding factor' in determining whether the primary jurisdiction doctrine should apply is 'efficiency.'" *Reid v. Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015) (quoting *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1165 (9th Cir. 2007)). Aside for LVAC's speculation, there is no indication that a new FCC order is imminent or any assurance such an order will conclusively resolve the

ATDS issue. As another court explained, "this cycle of staying a case while an FCC order is pending only to have the FCC order challenged in court has played out before, demonstrating the real possibility of indefinite delay." *See Pieterson*, 2018 WL 3241069, at *5; *see also Larson*, 2018 WL 6459964, at *4 ("[A]ny action from the FCC will be subject to further challenge, which is exactly what happened with the 2015 Declaratory Ruling."); *Goldschmidt v. Rack Room Shoes*, No. 18-21220, 2019 WL 166629, at *1 (S.D. Fla. Jan. 4, 2019) ("[D]espite Defendant's assertion that the ruling is expected by late 2018 or early 2019, there is no real indication that the FCC will in fact issue a ruling by a certain date.").

In sum, the Court is unconvinced that judges are incompetent to construe the TCPA to define the contours of an ATDS. Moreover, even if LVAC's speculation is correct and the FCC order is looming, the Court is skeptical that such an order would bring finality to the issue of what constitutes an ATDS. Accordingly, the Court declines to stay this matter under the primary jurisdiction doctrine.

### b. Inherent Authority to Stay

"A district court has discretionary power to stay proceedings in its own court under [*Landis*]." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (citing *Landis v. North American Co.*, 299 U.S. 248, 254 (1936)). When deciding whether to issue a stay, the court must weigh competing interests including: (1) the possible damage which may result from the granting of a stay; (2) the hardship or inequity which a party may suffer in being required to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay. *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). The proponent of a stay bears the burden of establishing its need. *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (citing *Landis*, 299 U.S. at 255).

As an initial matter, *Landis* stays "should not be granted unless it appears likely the other proceedings will be concluded within a reasonable time." *Leyva v. Certified Grocers of California, Ltd.*, 593 F.2d 857, 864 (9th Cir. 1979); *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*, 498 F.3d 1059, 1066 (9th Cir. 2007) ("Generally, stays should not be indefinite in nature."). As discussed above, the Court is not convinced that an FCC order is imminent or that such an order will settle the dispute over the definition of an ATDS. Just as the 2015 FCC Order gave rise to the *ACA Int'l* consolidated appeal, a new FCC order may very well bring about more legal challenges, further delaying resolution. Thus, a stay here would not serve the orderly course of justice.

As to the balance of hardships, LVAC claims that without a stay, "LVAC would be required to spend significant time and resources defending this lawsuit, even though the FCC's ruling . . . could dispose of a significant portion of Plaintiff's claims." (Mot. to Stay 12:11–23). However, in this Circuit, "being required to defend a suit, without more, does not constitute a clear case of hardship or inequity" for purposes of a stay. *Hawai'i v. Trump*, 233 F. Supp. 3d 850, 854 (D. Haw. 2017) (quoting *Lockyer*, 398 F.3d at 1112). Additionally, LVAC's argument presupposes that the FCC's order will be favorable to its position. Because a future FCC order may support either party's case, the Court finds the balance of the hardships is neutralized.

Finally, with respect to potential damage arising from the stay, LVAC argues that the "only conceivable harm that Plaintiff could experience from a stay is temporary delay in pursuing his requested relief." (Mot. to Stay 11:21–22). Plaintiff responds that because LVAC "cannot tell us with any degree of certainty whether the FCC will issue any new rulings or guidance," a stay would be indefinite and prejudice Plaintiff's "right to have his claim resolved." (Resp. to Mot. to Stay at 3, ECF No. 38).

LVAC cites authority for the proposition that a "[d]elay in obtaining money damages . . . does not constitute sufficient prejudice for purposes of the stay analysis." (Mot. to Stay 11:21–12:5). Those cases, however, include express findings that the respective stays would be of limited duration—a finding this Court does not make. *Cf. Doerken v. USAA Sav. Bank*, No. 16-cv-08824-RSWL-MRW, 2017 WL 1534186, at *3 (C.D. Cal. Apr. 26, 2017) ("[T]he appeal is not likely to remain pending for an extended period of time, and the possible prejudice to Plaintiff is minimal."); *Reynolds v. Geico Corp.*, No. 2:16-cv-01940-SU, 2017 WL 815238, at *4 (D. Or. Mar. 1, 2017) ("Further, '[t]his case is in the early stages of litigation and in all likelihood, the stay will not be lengthy,' especially as the D.C. Circuit has already heard oral argument in *ACA International*.'"). Here, in contrast, LVAC has not satisfied the Court that a stay in this matter would be of limited duration.

Accordingly, the Court declines to issue a *Landis* stay. LVAC has not carried it burden of demonstrating hardship or that a stay would serve the orderly course of justice. To the extent LVAC has established that a stay would result in de minimis harm to Plaintiff, this consideration is outweighed by the other *Landis* factors.

### B. Motions for Summary Judgment

Plaintiff seeks summary judgment on the TCPA claim, asserting the evidence demonstrates LVAC placed calls using an ATDS, and that LVAC willfully continued calling Plaintiff after he revoked his consent. (Pl.'s MSJ 6:9–14:17). LVAC counters that Plaintiff can neither show that the Nuxiba system is an ATDS nor that Plaintiff validly revoked his consent under the Membership Agreement. (LVAC's MSJ 6:4–13:4).

#### 1. TCPA

As discussed above, the TCPA makes it unlawful to make any call "using any automatic telephone dialing system" to any "cellular telephone service," in the absence of the called party's prior consent. *See* 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA dispute in this case centers

upon whether the Nuxiba system, on which LVAC placed calls to Plaintiff, meets the definition of an ATDS, and whether Plaintiff consented to receiving LVAC's calls.

### a. Whether the Nuxiba System is an ATDS

In light of the Ninth Circuit's holding in *Marks*,[3] there is no genuine dispute that the Nuxiba system is an ATDS. An ATDS "means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person)." *Marks*, 904 F.3d at 1052.

The evidence in the record demonstrates the Nuxiba system has the present capacity to store numbers to be called, and to dial such numbers. Nuxiba's President declares that the system dials "phone numbers loaded into the system by an LVAC system administrator." (Nuxiba Decl. ¶¶ 3–4, Ex. 2 to LVAC's MSJ, ECF No. 24-2). LVAC's 30(b)(6) designee also testified that the system dial calls from a pre-loaded database of numbers, connecting live calls to available agents. (*See* LVAC 30(b)(6) Dep. 18:9–24, 23:1–16, Ex. 2 to Pl.'s Reply, ECF No. 32-2); (*see also* LVAC's MSJ 4:10–14) (explaining that LVAC added Plaintiff's phone number to a spreadsheet, which was subsequently uploaded "to a phone system, which would place a call to a phone number included on the spreadsheet.").

LVAC contends that the Court must consider whether the Nuxiba system has the capacity to randomly or sequentially generate numbers. (LVAC's MSJ 7:6–10). The authorities LVAC cites, however, precede the Ninth Circuit's holding in *Marks*.[4] Because the *Marks* Court held that an ATDS includes systems that "store numbers to be called," the fact

---

[3] *Marks* was decided after the parties briefed their summary-judgment Motions.

[4] LVAC relies upon the now-vacated district court order in *Marks* as well as this Court's decision in *Marshall*. (*See* LVAC's MSJ 6:17–8:15, ECF No. 24) (citing *Marks v. Crunch San Diego, LLC*, 55 F. Supp. 3d 1288 (S.D. Cal. 2014), *vacated and remanded*, 904 F.3d 1041 (9th Cir. 2018); *Marshall v. CBE Grp., Inc.*, No. 2:16-cv-02406-GMN-NJK, 2018 WL 1567852 (D. Nev. Mar. 30, 2018)).

that the Nuxiba software cannot generate numbers on its own no longer ends the ATDS inquiry.[5] *See Marks*, 904 F.3d at 152.  As there is no genuine dispute that the Nuxiba system dials from a stored list of phone numbers, the system is an ATDS as a matter of law.

### b.  Authority to Revoke Prior Express Consent

Given that the TCPA only prohibits calls without "the prior consent of the called party," 47 U.S.C. § 227(b)(1)(A), the Court turns to whether Plaintiff consented to LVAC's calls. Plaintiff does not dispute LVAC's argument that under the Membership Agreement, Plaintiff initially consented to receiving LVAC's calls to his cell phone. (Pl.'s Resp. 5:5–6, ECF No. 29).  Instead, the parties' disagreement concerns whether the Membership Agreement precluded Plaintiff from revoking his consent and, if not, whether there is an issue of fact regarding Plaintiff's revocation. (*Id.* 8:1–9:9); (LVAC's MSJ 9:8–12:9).

In *Van Patten v. Vertical Fitness Grp., LLC*, the Ninth Circuit Court of Appeals followed the lead of sister circuits in holding that "the TCPA permits consumers to revoke their prior express consent to be contacted by telephone autodialing systems." 847 F.3d 1037, 1048 (9th Cir. 2017); *see also Gager v. Dell Fin. Servs.,* LLC, 727 F.3d 265, 270 (3d Cir. 2013); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014).  Ninth Circuit courts, applying *Van Patten*, have held that prior express consent, even if obtained through a contract between the parties, does not preclude a party from revoking consent. *See, e.g.*, *Self-Forbes v. Advanced Call Ctr. Techs., LLC*, No. 17-15804, 2018 WL 5414613, at *2 (9th Cir. Oct. 29, 2018) (reversing grant of summary judgment in the defendant's favor on consent revocation notwithstanding the plaintiff's prior consent to be called under the terms of her credit card application); *Herrera v. First Nat'l Bank of Omaha, N.A.*, No. 2:17-cv-01136-RSWL-SKA,

---

[5] LVAC also points the Court to *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018), which the *Marks* Court expressly declined to follow. *See Marks*, 904 F.3d at 1052 n.8 ("Because the Third Circuit merely avoided the interpretive questions raised by the statutory definition of ATDS, its published opinion is unpersuasive.")

2017 WL 6001718, at *3 (C.D. Cal. Dec. 4, 2017); *Jara v. GC Servs. Ltd. P'ship*, No. 2:17-cv-04598-ODW-RAO, 2018 WL 2276635, at *3 (C.D. Cal. May 17, 2018).

LVAC urges the Court to follow *Reyes v. Lincoln Auto. Fin. Servs.*, where the Second Circuit held "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent . . . ." 861 F.3d 51, 56–57 (2d Cir. 2017). In that case, because the plaintiff's consent was part of an "express provision of a contract to lease an automobile"—rather than a "gratuitous" manifestation of assent—the plaintiff could not unilaterally revoke it. *Id.* at 57. LVAC argues the *Reyes* Court has the right approach because it is based upon "generally-accepted contractual common law," and "consistent with the D.C. Circuit's [*ACA Int'l*] decision and the FCC's interpretations of consent revocation." (LVAC's MSJ 11:1–11).

Preliminarily, the Court is bound by the Ninth Circuit's ruling in *Van Patten*. To the extent *Reyes* may serve as persuasive authority, the Court finds it cannot be reconciled with *Van Patten*, *ACA Int'l*, or the 2015 FCC Order. First, the 2015 FCC Order states that "callers may not abridge a consumer's right to revoke consent using any reasonable method." 30 FCC Rcd. at 7996 ("[C]onsumers must be able to respond to an unwanted call— using either a reasonable oral method or a reasonable method in writing—to prevent future calls."). The D.C. Circuit subsequently endorsed the "[FCC's] approach to revocation of consent, under which a party may revoke her consent through any reasonable means clearly expressing a desire to receive no further messages from the caller." *ACA Int'l*, 885 F.3d at 692.

As to whether the *Reyes* Court properly applied common-law understandings of consent revocation, this contention is immaterial. The 2015 FCC Order explicitly sets forth a statutory, rather than common law, right of revocation. *See 2015 FCC Order*, 30 FCC Rcd. at 7995 ("We do not rely on common law to interpret the TCPA to include a right of revocation. We simply

note our conclusion is consistent with the common law right of revocation and do not attempt to substitute common law for statutory law.").

Last, LVAC asserts that *Reyes* is in harmony with *ACA Int'l* because the D.C. Circuit noted that the FCC has yet to address "revocation rules mutually adopted by contracting parties," or "parties' ability to agree upon revocation procedures." *ACA Int'l*, 885 F.3d at 710. This argument, even if credited, has no bearing on this case as the Membership Agreement is without any revocation mechanism. (*See* Membership Agreement, Ex. 1-B to LVAC's MSJ, ECF No. 24-1); *see also Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 600 (M.D. Tenn. 2018) ("The parties here did not contractually agree to a revocation mechanism. In the absence of such an agreement, *ACA International* supports the FCC's objection to the very type of unilateral imposition of irrevocable consent that was sanctioned in *Reyes* and is advocated by [the defendant] here."); *Rodriguez v. Premier Bankcard, LLC*, No. 3:16-cv-2541, 2018 WL 4184742, at *11 (N.D. Ohio Aug. 31, 2018) ("[T]he FCC's clarification does not help Premier in this case, because here, there is also no 'particular revocation procedure' set by 'mutual agreement' between the parties.").

In sum, the Court declines LVAC's invitation to follow the Second Circuit's holding in *Reyes*. The Court now considers whether there is a factual dispute regarding Plaintiff's alleged revocation of consent.

### c. Whether Plaintiff Revoked His Prior Express Consent

Consumers may revoke their consent, orally or in writing, to be contacted under the TCPA, but "[r]evocation of consent must be clearly made and [the consumer] must express a desire not to be called . . . ." *Van Patten*, 847 F.3d at 1047–48*; see also ACA Int'l*, 885 F.3d at 692. "[A] factual dispute regarding alleged revocation of consent cannot be properly resolved on summary judgment." *Herrera*, 2017 WL 6001718, at *4; *see also Osorio*, 746 F.3d at 1256.

Plaintiff has adduced evidence that on three occasions—between December 2016 and April 2017—he requested that LVAC cease calling him. (Singer Decl. ¶ 5, Ex. 2 to Pl.'s MSJ, ECF No. 23-2); (*see also* Recordings of Calls, Exs. 1, 4–5 to Pl.'s MSJ, ECF Nos. 23-3, 23-6, 23-7).  Plaintiff also points to LVAC's debt-collection notes, which show that LVAC documented Plaintiff's requests but nonetheless continued to call Plaintiff. (*See* Collection Notes, Ex. 4 to Pl.'s MSJ, ECF No. 23-4).  LVAC contends that Plaintiff's alleged oral revocations were too ambiguous to be afforded legal weight. (LVAC's Resp. 21:20–22:16).

Upon review of the parties' competing evidence and arguments, the Court finds a genuine issue of material fact as to whether Plaintiff revoked his consent on the initial December 29, 2016 call.  The Court also finds no genuine dispute that Plaintiff expressly revoked his consent on February 15, 2017, rendering subsequent calls violative of the TCPA.

### i.    December 29, 2016 Call

On the December 29, 2016 call, LVAC's agent introduced himself and asked Plaintiff if he was prepared to make a payment. (Recording of December 29, 2016 Call, Ex. 1 to Pl.'s MSJ, ECF No. 23-3).  Plaintiff responded, "not right now but I want you guys to stop calling me. I don't have the money right now." (*Id.*).  The agent replied, "I do apologize for the inconvenience. . . . I will try to push that date out for you to give you some time to come up with the payment," to which Plaintiff stated, "thanks." (*Id.*).  LVAC's collection notes show that the agent wrote "CNT PAY AT THIS TIME . . . REQ STOP CLLNG." (*See* Collection Notes at 2, Ex. 2 to Pl.'s MSJ, ECF No. 23-4).

On the one hand, a reasonable jury could find that Plaintiff's words, "I want you guys to stop calling me," against the backdrop of LVAC's collection notes, indicate that Plaintiff revoked his consent and that LVAC understood the message.  On the other hand, a jury could reasonably determine, based on the remainder of the call, that Plaintiff and LVAC merely

agreed to temporarily suspend, or "push out," the calls to allow Plaintiff to come up with his payment.

### ii.   February 15, 2017 Call

On the February 15, 2017 call, LVAC's agent again identified himself and asked Plaintiff if was able to make a payment. (Recording of February 15, 2017 Call, Ex. 4 to Pl.'s MSJ, ECF No. 23-6).  Plaintiff responded "I've asked you guys to stop calling me.  I don't have the money." (*Id.*).  LVAC's agent summarized the call as follows: "SD DONT HAVE THE MONEY. . . STOP CALLING." (*See* Collection Notes at 2, Ex. 2 to Pl.'s MSJ).

No reasonable jury could construe Plaintiff's request as anything other than a clear request that LVAC stop calling him.  Unlike the December 29, 2016 call, Plaintiff and the LVAC agent do not engage in any dialogue that could be interpreted as an agreement to merely extend or "push out" the date of the next scheduled call.  Additionally, LVAC's collection notes summarizing the call lend support to the notion that Plaintiff unambiguously conveyed his revocation.

Therefore, the Court finds no genuine dispute that Plaintiff revoked his consent as of February 15, 2017.  Thus, LVAC's calls using an ATDS after that period violated the TCPA.  However, because there is a factual issue as to the clarity of Plaintiff's purported December 29, 2016 revocation, that question will be left to a jury.

### 2.   Intrusion Upon Seclusion

The tort of intrusion upon seclusion is "grounded in a plaintiff's objective expectation of privacy." *Franchise Tax Bd. of State of California v. Hyatt*, 407 P.3d 717, 734 (Nev. 2017).  "To recover for the tort of intrusion, a plaintiff must prove the following elements: 1) an intentional intrusion (physical or otherwise); 2) on the solitude or seclusion of another; 3) that would be highly offensive to a reasonable person." *People for Ethical Treatment of Animals*

*(PETA) v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1279 (Nev. 1995), *overruled on other grounds by City of Las Vegas Downtown Redev. Agency v. Hecht*, 940 P.2d 127 (Nev. 1997).

"While what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court . . . ." *Id.* 1281–82 (citation omitted). Whether "conduct will be regarded as a 'highly offensive' intrusion is largely a matter of social conventions and expectations." *Kuhn v. Account Control Tech., Inc.*, 865 F. Supp. 1443, 1449 (D. Nev. 1994) (citation omitted). Courts look to "the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Id.*

Here, neither party has satisfactorily argued the elements of intrusion upon seclusion to shift the summary-judgment burden to the other party. Instead, both parties rehash their TCPA-related arguments, contending that the Court's findings on the TCPA claim dictate a result as to the intrusion claim.

According to Plaintiff, because the Ninth Circuit has recognized that "a TCPA claim is intrinsically an invasion of privacy claim," Plaintiff's success on his TCPA claim entitles him to the same on intrusion upon seclusion. (Pl.'s MSJ 14:20–15:11) (citing *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 804 (9th Cir. 2017)). This argument is without merit. Unlike an intrusion upon seclusion claim, the TCPA does not require a showing that the calls would be "highly offensive to a reasonable person." *Compare* 47 U.S.C. § 227(b)(1)(A), *with PETA*, 895 P.2d at 1279.

LVAC asserts that Plaintiff cannot establish he had a reasonable expectation of privacy because Plaintiff "expressly authorized LVAC to call him." (LVAC's MSJ 12:25–27). The fact of Plaintiff's initial consent, however, does not foreclose liability for the tort of intrusion. Indeed, a reasonable jury could conclude that despite Plaintiff's prior consent, the manner of

LVAC's ensuing debt collection, particularly the volume and frequency of the calls, would be highly offensive to a reasonable person.

All told, Plaintiff has not demonstrated a prima facie case of intrusion, and LVAC has not negated any essential element of Plaintiff's claim. Accordingly, both parties' Motions must be denied as to the intrusion claim.

### C. Motion for Leave to Amend

Plaintiff moves to amend his Complaint to update the alleged number of "times [LVAC] called Plaintiff's cell phone" after he allegedly revoked consent on December 29, 2016. (Mot. for Leave 1:21–25, ECF No. 22). Plaintiff asserts that his Motion meets the standard under Federal Rule of Civil Procedure 15(a), as there is an absence of bad faith and prejudice to LVAC, and amendment would not be futile or unduly delay proceedings. (*Id.* 3:13–8:21).

LVAC opposes Plaintiff's Motion stating Plaintiff fails to address the good cause standard under Rule 16(b). (Resp. to Mot. for Leave 4:8–11, ECF No. 26). According to LVAC, Plaintiff cannot demonstrate good cause because: (1) Plaintiff likely knew of the number of calls LVAC placed to Plaintiff; (2) Plaintiff waited until the end of discovery to reveal the additional calls; and (3) Plaintiff's counsel represented to LVAC's counsel that he would not seek amendment to allege the additional calls. (*Id.* 4:12–24).

Rule 15(a)(2) of the Federal Rules of Civil Procedure permits courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Once a court has filed a pretrial scheduling order, however, Rule (16)(b) governs rather than Rule 15(a). *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992). Rule 16(b) requires a showing of "good cause" in order to modify a scheduling order. *Id.* 608–09; Fed. R. Civ. P. 16(b). Only if the movant establishes good cause under Rule 16 does the court consider the propriety of amendment under Rule 15. *Johnson*, 975 F.2d at 609.

Plaintiff has not articulated good cause for the untimely amendment. "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Id.* Under the scheduling order, the parties' deadline to amend the pleadings was November 21, 2017; the discovery cut-off date was March 16, 2018; and dispositive motions were due on April 27, 2018. (*See* Scheduling Order 2:15–24, ECF No. 11). Plaintiff filed his Motion for Leave on April 16, 2018, (ECF No. 22).

Plaintiff erroneously applies the more lenient standard of Rule 15, "which focuses on the bad faith," of the moving party and "the prejudice to the opposing party." *Johnson*, 975 F.2d at 609. Even if the Court were to find an absence of bad faith and no prejudice to LVAC, these findings are immaterial without a preliminary showing of diligence on Plaintiff's part, or else an explanation for the untimely request. *Id.*

Plaintiff claims he did not know of LVAC's additional phone calls at the time he brought this action. (Mot. for Leave 5:1–4). Plaintiff states that screenshots of his cell phone, purportedly showing the correct number of phone calls at issue, were given to LVAC "early in the litigation," and that LVAC "had them for months before they took Plaintiff's deposition." (*Id.* 6:8–9). This argument is unhelpful for two reasons. First, this reasoning goes toward prejudice to LVAC rather than Plaintiff's diligence in seeking amendment. Second, and more significantly, this concession signifies that Plaintiff knew of the additional calls well in advance of his untimely Motion.

Without identification of when Plaintiff obtained this information in discovery or description of Plaintiff's good-faith attempt to timely amend, the Court cannot discern—one way or the other—whether Plaintiff's efforts were diligent. As such, Plaintiff has not carried his burden of showing good cause under Rule 16. Plaintiff's Motion for Leave to Amend is therefore denied. *See Johnson*, 975 F.2d at 609 ("If the party was not diligent, the inquiry should end.").

## IV.    CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 23), is **GRANTED in part** and **DENIED in part**.  Plaintiff's Motion as to the TCPA claim is **GRANTED** to the extent it applies to LVAC's calls after February 15, 2017.  The Motion is **DENIED** as to LVAC's calls prior to February 15, 2017.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on his intrusion upon seclusion claim is **DENIED**.

**IT IS FURTHER ORDERED** that LVAC's Motion for Summary Judgment, (ECF No. 24), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend, (ECF No. 22), and LVAC's Motion to Stay, (ECF No. 37), are **DENIED**.

**IT IS FURTHER ORDERED** that LVAC's Motion for Leave to File Supplemental Authority, (ECF No. 34), is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties shall file a Joint Pretrial Order within thirty (30) days of this Order's issuance.

**DATED** this __25__ day of March, 2019.

_____

Gloria M. Navarro, Chief Judge
United States District Judge